UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.            ) | No: 2:24-cr-41-JAW |
| ) | |
| GABRIEL SANCHEZ ) | |

DEFENDANT'S MOTION TO SUPPRESS AND
INCORPORATED MEMORANDUM OF LAW

Defendant Gabriel Sanchez, by and through undersigned counsel, MOVES this Honorable Court to suppress all evidence obtained directly and indirectly as a result of his illegal seizure, and for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

## FACTS

This motion reflects information contained in discovery produced to date, including video footage from several body worn cameras (BWCs) of the Auburn Police officers on the date in question.[1] In order to justify a *Franks* hearing, facts from these sources are compared below to the sworn allegations of Sergeant Nicholas Gagnon in his Affidavit and Request for a Search Warrant ("Affidavit").[2]

1. **THE CALLER'S CONCERNS DID NOT AMOUNT TO ANY CRIME.**

On September 20, 2023, at approximately 5:41 p.m., several uniformed Auburn Police officers responded to a report involving a "suspicious condition" at the Irving/Circle at 21 Center Street in Auburn (hereinafter, the "gas station").[3] According to Auburn Police Department records, dispatch broadcast the following details:

---

[1] Reference to events on BWC videos reflect the time of day displayed across the top of the footage.
[2] Marked as Def.'s Ex. 1.
[3] Auburn Communication Dispatch Log ("Call Log") marked as Def.'s Ex. 2, at 1.

1

>BEHIND THE GAS STATION
>W/M BLACK CURLY HAIR, WHITE TANKTOP APPROACHED HIM AND SHOWED HIM A FIREARM HE HAD TUCKED IN HIS WAISTBAND AND ASKED HIM WHAT HE WAS DOING. CONFIRMED NO THREATS MADE WITH IT. DESC AS A TAN PISTOL. CALLER CURRENTLY IN THE FORTINS PARKING LOT.[4]

At approximately 5:51 p.m., Officer Sergio Martins met with the caller, J.O., in a parking lot down the street from the gas station[5] while Officer Travis Barnies and Gagnon drove to the gas station. Martins was familiar with J.O. According to Androscoggin County Unified Criminal Court records, J.O. was on bail for two burglaries, felony criminal mischief, and refusing arrest.[6]

J.O. explained that he was walking in the woods behind the gas station when a male asked him what he was doing and lifted his t-shirt to reveal what *appeared to be* a firearm in his waistband. The male did not remove the alleged firearm from his waistband, touch it, or point it at him. J.O. explained that he was concerned someone had a firearm near a pathway in the woods.[7] J.O. did not report anyone else being in the area during his interaction with the male. Martins asked J.O. what he wanted the police to do, and J.O. said "nothing."[8] Before leaving J.O., Martins again asked if he "wanted to pursue charges," and asked J.O. if he was in fear. J.O. indicated that he was not and told Martins to "just drop it."[9] Martins asked J.O. a second time if he was "in actual physical fear," to which J.O. again replied "no."[10] Martins suggested that the male was just being "protective"[11] or "territorial" of his "his turf" in the woods.[12] When J.O. confirmed that he did not want police involvement, Martins broadcasted over the radio that J.O. was "unwilling to prosecute

---

[4] *Id*.
[5] Martins Body Worn Camera (BWC) Video marked as Def.'s Ex. 3.
[6] Criminal Docket No. ANDCD-23-2274, marked as Def.'s Ex. 4.
[7] Martins BWC @ 17:51:10.
[8] *Id.* @ 17:52:28.
[9] *Id.* @ 17:54:03-21.
[10] *Id.* @ 17:54:22-25.
[11] *Id.* @ 17:54:37.
[12] *Id.* @ 17:55:28.

if found."[13] Martins' broadcast can be heard on Gagnon's BWC footage as Gagnon approached Mr. Sanchez's tent.[14]

> **Note: In Paragraph 1 of his Affidavit, Gagnon omitted the caller's pending felonies, the fact that no threats were made by the male with *what appeared to be* a firearm, and that the caller refused to prosecute if the male was found.**

In sum, J.O. did not report a crime. He did not feel threatened. He refused to cooperate with a police investigation. There was no evidence that the object in the male's waistband was an actual firearm, as opposed to a toy. In general, it is not illegal to possess a firearm in Maine, or to carry a concealed firearm with the proper permit. *See, e.g.,* 25 M.R.S.A. § 2001-A. An individual's possession and display of an object resembling a firearm in a *non-threatening* manner is not a crime. Nevertheless, Martins set out to join Barnies and Gagon in the woods.

2. **MR. SANCHEZ'S SEIZURE.**

In the meantime, at approximately 5:57 p.m., Defendant Gabriel Sanchez and two females—Tessa Martin and Crystal Murray—were inside a tent in a wooded area abutting the Androscoggin River. Mr. Sanchez's campsite encompassed a small area directly adjacent to a walking path, a make-shift extension of the Auburn Riverwalk trail. Around the curtilage of the tent were containers with various belongings in them, tarps, and a felled tree being used to dry clothes. Further down the path was another tent, occupied by Samantha and Brandon Edwards. Below is a picture of Mr. Sanchez's tent and the Edwards' tent further down the path, with the river in the background.

.

---

[13] *Id.* @ 17:55:54.
[14] Gagnon's Body Worn Camera (BWC) Video marked as Def.'s Ex. 5 @ 17:58:25.



Barnies was the first to confront Mr. Sanchez and the other campers. As he approached Mr. Sanchez's tent, he yelled, "Knock! Knock! Auburn police."[15] One of the campers, Crystal Murray, peered out the entryway of the tent, partially covered by a tarp. A dog inside the tent began to bark. Officer Barnies walked closer to the tent and the following exchange with Mr. Sanchez, a bearded male inside the tent, ensued:

> Barnies: Hi. What's up?
> Sanchez: Hey. What's going on?
> Barnies: What are we doin'?
> Sanchez: Not Much.
> Barnies: You can't be camping here.
> Sanchez: Alright.
> Barnies: Nah, railroad has us coming through make sure no one's out here.

---

[15] Barnies Body Worn Camera (BWC) Video marked as Def.'s Ex. 6 @ 17:57:16.

> Female: Oh, Okay.
> Sanchez: I understand that. I'm not trying to hide nothin' from you, just trying to hold the dog back.[16]

When Samantha Edwards walked up from her tent further down the path, Barnies reiterated to Ms. Edwards that the "railroad" owned the property and did not want campers present.[17] This was a lie. First, the "railroad" did not own the property. The wooded area behind the gas station (Parcel I.D. 251-019) is owned by Franklin Enterprises LLC, not a railroad.[18] The owner of the land on which the gas station is situated (Parcel I.D. 251-018) is Spirit SPE Portfolio c/o Irving Oil Corp.[19] Maine Central Railroad owns land upon which the railroad runs, which is not in the vicinity of Mr. Sanchez's tent or the gas station.[20]

Second, there was no evidence that Mr. Sanchez and the other campers were trespassing. There was no evidence that the landowner of the wooded area, Franklin Enterprises LLC, took any steps to exclude intruders. Although there was a crude "No Trespassing" sign behind the gas station, there is no evidence of who posted the sign or whether anyone camping along the river saw the sign, and it is unclear what area the sign was marking—the gas station's back lot? Or the path into the woods? Maine trespassing law requires signs to be posted in a manner reasonably likely to come to the attention of intruders. 17-A M.R.S.A. § 402(1)(C), (4). The gas station's sign would not qualify as notice to campers along a path by the river. And there is no evidence that Mr. Sanchez entered the woods from behind the gas station such that he would have seen the sign because the path behind the gas station was not the only way to arrive at Mr. Sanchez's campsite. There were no postings where Mr. Sanchez was camping on the side of a path that ran along the

---

[16] Barnies BWC @ 17:57:22-50.
[17] *Id.* @ 17:58:13.
[18] Parcel Maps, marked as Def.'s Exs. 7, 7A.
[19] Parcel Map, marked as Def.'s Ex. 7B.
[20] Parcel Map, marked as Def.'s Ex. 7C.

river. Bottom line, there was no evidence that Mr. Sanchez's presence was objectionable to the landowner. There was also no evidence that the Auburn police officers were granted authority by Franklin Enterprises LLC to enforce trespass laws on the property or order campers to vacate.

> **Note: In the "Description of the property to be searched" and Paragraph 2 of his Affidavit, Gagnon misrepresented that the area in which Mr. Sanchez was camping was "clearly marked" as a "No Trespassing area with signs."**

While Barnies was speaking to Ms. Edwards, Ms. Murray exited Mr. Sanchez's tent and began to walk away, down the path.[21] She was blocked by Gagnon, who was approaching the scene. He ordered her to return to Mr. Sanchez's campsite purportedly to be served a trespass notice,[22] although no one was ever issued a trespass notice--proof that officers had no authority to do so. Nevertheless, Gagnon told the campers they could be "arrested right this minute" and ordered them to "pack up."[23] Barnies asked for the campers' identifications a second time. He acknowledged seeing other campers nearby and said he would talk to them next.[24]

While Barnies detained the campers, Gagnon began trudging through the woods across the path from Mr. Sanchez's campsite. Below is a shot from Martins' BWC video showing Gagnon in the distance (circled in red).[25]

---

[21] Gagnon BWC @ 17:58:33.
[22] Id. @ 17:58:38.
[23] Id. @ 17:59:07.
[24] Id. @ 18:00:17-31.
[25] Martins BWC @ 18:01.



Gagnon's BWC captured what he observed on the ground in an area clearly separate from Mr. Sanchez's campsite: cardboard, trash, a backpack, two capped syringes on the ground near the backpack and several orange syringe caps.[26] Gagnon asked the campers who owned the backpack. No one claimed the backpack.[27] Gagnon searched the backpack. Gagnon's BWC shows several unused syringes in the backpack, some in a baggie and others loose in the bag.[28] No drugs were recovered from the backpack or in the clearing Gagnon inspected.

> **Note: In Paragraph 3 of his Affidavit, Gagnon mispresented that there was "drug paraphernalia all over the area" around Mr. Sanchez's tent.**

There was no drug paraphernalia around Mr. Sanchez's tent. BWC footage shows Ms. Morin and Ms. Murray walking around their campsite with bare feet, a fact indicating the lack of syringes on the ground. Gagnon acknowledged in his Affidavit that the area was known as a place "for unhoused people to sleep," and the abandoned backpack was evidence of someone else's

---

[26] Gagnon BWC @ 18:01:32.
[27] *Id.* @ 18:00:5.
[28] *Id.* @ 18:01:56-18:03:43.

presence at some point.

While Gagnon searched the backpack, the campers complied with Barnies' request and provided their names, dates of births and the last four digits of their social security numbers.[29] After hearing Mr. Sanchez give his name, Gagnon believed Mr. Sanchez was previously convicted of unlawful possession of a firearm and he endeavored to gin up probable cause to search Mr. Sanchez's tent.

### 3.  GAGON BRIBED BRANDON EDWARDS TO INCRIMINATE MR. SANCHEZ.

**"Bribe." To give, offer, or promise a sum of money, gift, or other inducement to (a person) in order to influence his or her behaviour, esp. to persuade him or her to act in one's favour.**

OXFORD ENGLISH DICTIONARY (Revised 2019).[30]

While Barnies detained the campers at Mr. Sanchez's tent, Gagnon escorted Samantha Edwards to hers.[31] She denied that anyone else was in her tent, but when she unzipped the tent door, Brandon Edwards was hiding inside.[32] Gagnon ordered Brandon to step out of the tent. He then had the following exchange with Samanatha:

> Gagnon: Hey are there any firearms around here? Does someone have a firearm?
> Samantha: "No, I don't think so. Why?
> Gagnon: "You sure? **Because I can help you out in the future if you're honest with me**, because we just got a report that he had a firearm and I know that he likes guns.
> Samantha: Who? [unintelligible]
> Gagnon: Was it in his tent? Did you see him with one?
> Samantha: I didn't see him with one, but I know the guy that was just here had one.
> Gagnon: He had one? Who was that?
> Samantha: I don't know who it was.
> Gagnon: What did he look like?
> Samantha: Yellow bike. That's all I know.[unintelligible]
> Gagnon: There's no guns in here?
> Samantha: No.[33]

---

[29] Barnies BWC @ 18:00:39-18:02:15.
[30] Found at https://www.oed.com/dictionary/bribe_v?tab=meaning_and_use#13746452.
[31] Gagnon BWC @ 18:05:04.
[32] *Id.* @ 18:05:15-34.
[33] *Id.* @ 18:05:49-18:06:27.

8

Gagnon then turned to Brandon:

> Gagnon: You got any warrants right now?
> Brandon: Nah.
> Gagnon: **If you do, and if you guys are honest with me, and I can find a gun right here, I'll look the other way on it.**
> Brandon: I tell you there's a gun in there and you'll let me go?
> Gagnon: Yep.
> Brandon: In his tent.
> Gagnon: In his tent?
> Brandom: Mhm.
> Gagnon: What color, what color gun?
> Brandon: Brown.
> Gagnon: I'm not even going to run you.[34]

Brandon Edwards was on probation for multiple recent theft convictions in Docket No. ANDCD-CR-20-1300; ANDCD-CR--21-1828; ANDCD-CR-22-2329; OXFCD-CR-23-96.[35] But as promised, Gagnon did not ask for Brandon's identification, or run a warrant check.

After speaking to the county prosecutor on-call, Gagnon asked Brandon additional questions:

> Gagnon: So here's the deal, I'm going to draft a search warrant for his tent. Am I gonna find a gun in there or you think that they ditched it out here?
> Brandon Edwards: I was just in there 5 minutes ago.
> Gagnon: Huh?
> Brandon Edwards: I was just in there like 10 minutes ago.
> Gagnon: In the tent?
> Brandon Edwards: Yeah.
> Gagnon: Alright.
> Brandon Edwards: You didn't hear that from me though.
> Gagnon: Your warrants aren't for like murder or anything, right?
> Brandon Edwards: No.
> Gagnon: Theft or something?
> Brandon Edwards: Yeah.
> Gagnon: Get it taken care of, OK?[36]
>
> **Note: In Paragraph 4 of his Affidavit, Gagnon stated:**
> **"I spoke to another anther party on scene and I learned that the person observed**

---

[34] Gagnon BWC @ 18:06:28-45.
[35] Me. State Bureau of Id. Criminal History Record marked as Def.'s Ex. 8.
[36] Gagnon BWC @ 18:14:58-18:15:26.

> **Gabriel with a firearm five to ten minutes prior to our arrival and that the firearm is in the tent. I asked what color and the person stated it was tan (he may have said brown, but it still matched what the original caller stated).**
>
> **Gagnon misrepresented that Brandon saw Mr. Sanchez with a firearm. Brandon only said, after inducement, that he saw a firearm in Mr. Sanchez's tent. Gagnon omitted 1) that Brandon was the source of this information, 2) that he bribed Brandon to incriminate Mr. Sanchez, and 3) that Brandon was on probation for committing multiple crimes of dishonesty.**
>
> **Gagnon also omitted his conversation with Samantha Edwards entirely, including 1) her denial that Mr. Sanchez had a firearm, and) her observation that a different male with a firearm left the area on a yellow bike.**

After Gagnon announced that he was leaving to obtain a search warrant for Mr. Sanchez's tent, Ms. Morin admitted having a "minor" amount of drugs and offered to relinquish what she had. Gagnon asked her about a firearm, and she denied the presence of a firearm.[37]

Ultimately, Mr. Sanchez, Ms. Morin and Ms. Murray were detained for nearly two hours while Gagnon obtained a search warrant. During their detention, both Mr. Sanchez and Ms. Morin admitted that a male left a firearm in their tent, which was relayed to Gagnon and included in his affidavit.

> **Note: Gagnon omitted that Mr. Sanchez's and Morin's statements were consistent with Samantha's statement about a male with the firearm who left the area.**

Eventually, the warrant was granted, the tent was searched, and a firearm was found along with drugs. Mr. Sanchez was arrested, and the instant federal case ensued.

## ARGUMENT

1. **MR. SANCHEZ WAS SEIZED IN THE ABSENCE OF REASONABLE ARTICULABLE SUSPICION.**

The Fourth Amendment of the U.S. Constitution protects citizens "against unreasonable searches and seizures." U.S. Const. amend. IV. Seizures short of an arrest are governed by the

---

[37] Gagnon BWC @ 18:12:43- 18:13:14.

Fourth Amendment's Reasonableness clause. *Terry v. Ohio,* 392 U.S. 1, 20 (1968). Within reason, officers may briefly detain a person based on reasonable articulable suspicion that he committed a crime. *United States v. Guerrero*, 19 F.4th 547, 554 (1st Cir. 2021) (quoting *Terry*, 392 U.S. at 22). An "inchoate and unparticularized suspicion or 'hunch'" of criminal activity committed by the suspect will not suffice. *Terry,* 392 U.S. at 27.

A Fourth Amendment seizure occurs either by "voluntary submission to a show of authority or the termination of freedom of movement." *Torres v. Madrid*, 592 U.S. 306, 322 (2021). A show of authority sufficient to constitute a seizure occurs where "the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business,'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (internal quotations omitted). In order to evaluate the constitutionality of a *Terry* stop, a court must determine when the stop began for Fourth Amendment purposes. The answer to that question delimits what information can be attributed to the investigating officers for the purpose of establishing reasonable suspicion.

**a. Timing of the Seizure.**

In the instant case, Mr. Sanchez and the others in his tent were seized when Barnies approached in full police uniform, yelling "Knock! Knock! Auburn police" to stir them out of the tent. He had a hunch that a male might be possessing a firearm illegally and used subterfuge in the form of a purported trespass violation to unlawfully detain Mr. Sanchez. Although Barnies ordered the campers to vacate, Gagnon would not let anyone leave and threatened arrest. All were held for questioning. None were issued trespass notices. The show of authority by Auburn Police officers was sufficient to constitute a seizure because no reasonable person would have felt at liberty to ignore the officers' presence, the conflicting orders to vacate but remain on scene, or the threat of

11

arrest. This was a *Terry* stop.

**b. The Seizure Was Unreasonable.**

There was insufficient evidence that a crime had been committed. At the outset of the seizure, there was a report that a male had *what appeared to be a firearm* in the woods and had shown it to J.O. When officers followed a path from behind the gas station to another path they observed two tents—Mr. Sanchez's and the Edwards'. Based on this information, it was unreasonable to seize Mr. Sanchez. There was no evidence J.O. observed an *actual* firearm, as opposed to a toy. He was not threatened, and he did not want to cooperate with an investigation. Also, there was no evidence that, had the object been an actual firearm, it was possessed unlawfully. There was no evidence that the male in question posed a danger to the community at large. There was no exigent circumstance at all and nothing to trigger the community caretaking function.

There was insufficient evidence that Mr. Sanchez was trespassing. No one reported a trespass where Mr. Sanchez was camped. There were no signs excluding intruders in the vicinity of his campsite. There was no evidence that Mr. Sanchez arrived at his campsite from the path behind the gas station where a makeshift sign hung ambiguously on a tree. Under Maine trespass law, an individual must be on notice that his entry or presence in a place is forbidden. 17-A M.R.S.A. § 492. There is no evidence Mr. Sanchez was on such notice. And there was no evidence the landowner did not want people camping on the property.

In sum, Mr. Sanchez was seized in violation of the Fourth Amendment. As such, all evidence, including statements, obtained directly or indirectly from his illegal seizure must be suppressed as fruits of the poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 484 (1963).

2. **GAGON'S AFFIDAVIT CONTAINED MATERIAL OMISSIONS AND MISREPRESENTATIONS MADE IN RECKLESS DISREGARD FOR THE TRUTH, NECESSITATING A *FRANKS* HEARING.**

The Fourth Amendment requires a warrant application to contain sufficient information to permit the issuing official to decide whether there is a fair probability that a crime has been committed given the circumstances in the application. *United States v. Barbosa*, 896 F.3d 60, 67 (1st Cir. 2018). "An application supporting a search warrant is presumptively valid," *United States v, Gifford*, 727 F.3d 92, 98 (1st Cir. 2013), but under certain conditions, a defendant can rebut the presumption and challenge the application at a pretrial hearing, *Barbosa* at 67 (internal quotation marks omitted). This is called a *Franks* hearing after the case that established the right to such a hearing. *See Franks v. Delaware,* 438 U.S. 154, 171 (1978).

A defendant is entitled to a *Franks* hearing "if he can make a substantial showing that the affiant intentionally or with reckless disregard for the truth included a false statement in the affidavit, which statement was necessary to the finding of probable cause." *Franks* at 155-56; *Barbosa*, 896 F.3d at 68 (quoting *United States v. Tanguay*, 787 F.3d 44, 48 (1st Cir. 2015)). Suppression of the evidence seized is justified if, at such a hearing, the defendant proves intentional or reckless falsehood by preponderant evidence and the affidavit's creditworthy averments are insufficient to establish probable cause. *Barbosa* at 68 (citing *Franks* at 56).

In addition to false statements, material omissions may also form the basis for a *Franks* Hearing. *Barbosa* at 68. "The required showing is two-fold: first, the omission must have been either intentional or reckless; and second, the omitted information, if incorporated into the affidavit, must be sufficient to vitiate probable cause." *Barbosa* at 67. "Recklessness may be inferred directly from the fact of omission only if 'the omitted information was critical to the probable cause determination.'" *Id*. (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 81 (1st Cir. 2005)). Omissions "designed to mislead, or ... made in reckless disregard of whether [it] would

13

mislead, the magistrate in his appraisal of the affidavit" trigger the exclusionary rule. *Id.* (quoting *United States v. Colkley,* 899 F.2d 297, 300–01 (4th Cir. 1990)).

"Where the primary basis for a probable cause determination is information provided by a confidential informant, the affidavit must provide some information from which a magistrate can credit the informant's credibility." *United States v. Gifford*, 727 F.3d 92, 99 (citing *United States v. Barnard*, 299 F.3d 90, 93 (1st Cir. 2002)). "[A] probable cause finding may be based on an informant's tip so long as the probability of a lying or inaccurate informer has been sufficiently reduced." *United States v. Greenburg,* 401 F.3d 63, 69 (1st Cir. 2005).

A warrant cannot be based on evidence obtained through illegal means. When evaluating affidavits containing "tainted" evidence, the illegally obtained evidence should be set aside and "the remaining content of the affidavit examined to determine whether there was probable cause to search, apart from the tainted averments." *United States v. Ford*, 22 F.3d 374, 379 (1st Cir. 1994) (quoting *United States v. Veillette*, 778 F.2d 899, 904 (1st Cir. 1985), *cert. denied*, 476 U.S. 1115 (1986)).

### a. Gagnon's False Statements Were, At Best, Reckless.

Gagnon's warrant affidavit contained three significant misrepresentations. First, he falsely claimed that Mr. Sanchez was trespassing in an area that was "clearly marked" with a "No Trespassing" sign. Second, he falsely claimed that drug paraphernalia was all over Mr. Sanchez's campsite. Third, and most egregious, Gagnon falsely claimed that Brandon saw Mr. Sanchez with a firearm. Given the totality of circumstances, Mr. Sanchez has made a substantial showing that these misstatements were made with reckless disregard for the truth and were essential to the finding of probable cause by the justice of the peace. Therefore, Mr. Sanchez is entitled to a *Franks* hearing.

If these misstatements are excised from the Affidavit, the information remaining would be the following:

- A report that a male displayed what appeared to be a firearm in his waistband.
- Mr. Sanchez fit the description of the male with what appeared to be a firearm.
- Mr. Sanchez was a felon.
- Ms. Morin admitted there were drugs in the tent.
- Mr. Sanchez and Ms. Morin eventually admitted a firearm was left in the tent by someone else.

However, Mr. Sanchez's statement of identity and status as a felon, Ms. Morin's statement about drugs in the tent, and their statements that someone left a firearm in the tent were the fruits of their illegal detention. When these tainted statements are set aside, as they must be, probable cause to search the tent is lacking because no crime was reported by the caller. Therefore, Mr. Sanchez is entitled to suppression of the evidence derived from the tent.

### b. Gagnon Intentionally or Recklessly Omitted Information That Would Have Vitiated Probable Cause.

In addition to false and tainted statements, Gagnon's affidavit is laden with omissions. Gagnon omitted 1) the caller's identity and pending criminal charges, 2) that the caller did not feel threatened, and 3) that the caller was unwilling to prosecute if the male was found. There can be little doubt that these details were essential to evaluate the caller's veracity and whether a crime involving a firearm was reported.

Regarding the informant, Brandon Edwards, Gagnon failed to identify him as the source of information about a firearm being in Mr. Sanchez's tent, failed to include his inducement of Brandon's statement, and failed to include his recent history of committing crimes of dishonesty. This omitted information—especially the bribe—was critical to assess the veracity of Brandon's

accusation, which was the only direct evidence that a firearm was probably in the tent at the time Gagnon left to apply for the warrant. Gagnon also omitted Samantha's statement denying that Mr. Sanchez had a firearm, which weakened the strength of Brandon's accusation. And he omitted Samantha's statement that another individual came through the area with a firearm around the time that J.O. made his report. An alternative suspect with a firearm who fled the area reduced the probability that Mr. Sanchez possessed a firearm that would be found in his tent.

In sum, recklessness may be inferred directly from Gagnon's omission of information critical to the probable cause determination: the veracity of witnesses, contradictory accounts, and the nature of the criminal conduct at issue. Accordingly, Mr. Sanchez has made a substantial showing that he is entitled to a *Franks* hearing. Had the foregoing omitted information been incorporated into the affidavit, especially the fact that Brandon was bribed to make his statement, a warrant to search Mr. Sanchez's tent would not have issued. Therefore, Mr. Sanchez is entitled to suppression of the evidence derived from the tent.

## CONCLUSION

Evidence was obtained during the course of Mr. Sanchez's illegal seizure and should be suppressed. Further, as the affidavit contained both material falsehoods and omissions, Mr. Sanchez has made the substantial preliminary showing to warrant granting of his request for a *Franks* hearing, after which it will be determined that suppression of the evidence is the only way to achieve justice in this case.

Dated:  June 10, 2024 					Respectfully submitted,

							/s/Heather Gonzales, Esq.
							Attorney for Defendant
							Assistant Federal Public Defender
							P.O. Box 595
							Portland, Me 04112-0595
							207-553-7070
							FAX: 553-7017
							Heather_gonzales@fd.org


# CERTIFICATE OF SERVICE

    I hereby certify that I have this day electronically filed the foregoing **Motion to Suppress** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

Dated:  June 10, 2024					/s/Heather Gonzales, Esq.
							Attorney for Defendant